# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

KEVIN B. YARBROUGH,

      Petitioner,

:

:

   -vs-

WARDEN, Mansfield Correctional
  Institution,

:

      Respondent.

Case No. 3:08-cv-123

District Judge Walter Herbert Rice
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

This habeas corpus case under 28 U.S.C. § 2254 arises from Petitioner Kevin Yarbrough's conviction for the aggravated murder of Wilma Arnett. It is ripe for decision on the merits upon the Petition (Doc. No. 3); the Return (Doc. No. 10), the Petitioner's Reply (Doc. No. 26), and the Warden's Sur-Reply (Doc. No. 31). Neither party sought discovery or an evidentiary hearing on this matter.

Ms. Arnett was murdered around midnight on May 9, 1994, or in the early morning hours of May 10, 1994. On February 23, 1996, the Shelby County Grand Jury charged Kenneth Yarbrough, indicting him on one count of aggravated murder with two capital specifications and one count of conspiracy to commit aggravated murder. At trial a jury found Yarbrough guilty of both charges and recommended the death penalty, which the trial judge imposed on February 3, 1997. The case was heard a number of times at both appellate levels in Ohio, finally concluding with the vacation of

Yarbrough's death sentence under *Atkins v. Virginia,* 536 U.S. 304 (2002)[1].  On April 11, 2007, he

was re-sentenced to life imprisonment with parole eligibility after thirty years.  This habeas corpus

petition followed in which Yarbrough pleads the following grounds for relief:

> **GROUND ONE:** The trial court deprived petitioner Yarbrough of his right to confront witnesses against him in violation of the sixth, Eighth, and Fourteenth amendments to the United States Constitution.

> **GROUND TWO:** The trial court violated petitioner Yarbrough's right to compulsory process under the Sixth and Fourteenth Amendments to the United States Constitution when it excludes [sic] evidence that tends to show someone other than the accused committed the crime in a capital trial for aggravated murder. The exclusion of such evidence also violates the petitioner Yarbrough's right to due process under the Fourteenth Amendment to the United States Constitution.

> **GROUND THREE:** Errors and omissions in the instructions during the trial phase of petitioner Yarbrough's capital trial deprived him of due process of law under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

> **GROUND FOUR:** Prosecutorial misconduct throughout petitioner Yarbrough's capital trial denied petitioner Yarbrough his due process right to a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution.

> **GROUND FIVE:** When the State failed to introduce sufficient evidence of aggravated murder, the resulting conviction deprived petitioner Yarbrough of substantive and procedural due process as guaranteed by the Eighth, Ninth, and Fourteenth Amendments of the United States Constitution.

> **GROUND SIX:** When defense counsel failed to adequately voir dire potential jurors, impeach a material witness, and object to constitutional errors, petitioner Yarbrough was deprived of the effective assistance of counsel as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

> **GROUND SEVEN:** Petitioner Yarbrough was denied his right to effective assistance of counsel when counsel failed to adequately

---

[1]The conspiracy conviction was vacated on direct appeal under Ohio law because Yarbrough was convicted of the completed offense.

investigate, prepare, and present evidence in Yarbrough's defense as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

**GROUND EIGHT:** Petitioner Yarbrough was denied his right to effective assistance of counsel when counsel failed to confront, cross-examine, and impeach Jermaine Jelks with prior inconsistent statements made to police, in violation of his rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

**GROUND NINE:** Petitioner Yarbrough was denied his right to effective assistance of counsel when counsel failed to confront, cross-examine, and impeach Annette Simmons with prior inconsistent statements made to police, in violation of his rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

**GROUND TEN**: Petitioner Yarbrough was denied his right to effective assistance of counsel when counsel failed to confront, cross-examine, and impeach Jewel Davis with prior inconsistent statements made to police, in violation of his rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

**GROUND ELEVEN:** Petitioner Yarbrough was denied his right to effective assistance of counsel when counsel failed to prepare and present an adequate defense, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

**GROUND TWELVE:** Petitioner Yarbrough was denied his right to a fair trial when the prosecution violated *Brady* by failing to disclose to the defense that witness for the prosecution had testified in exchange for sentence reduction on unrelated charges, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

**GROUND THIRTEEN:** Petitioner Yarbrough was denied his right to a fair trial when the prosecution violated *Brady*, by knowingly withholding exculpatory evidence from the defense, in violation of his rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

**GROUND FOURTEEN:** Petitioner Yarbrough was denied his right to a fair trial when the prosecution violated *Brady*, by knowingly allowing Jermaine Jelks to testify falsely, in violation of petitioner Yarbrough's rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

(Quoted in Answer, Doc. No. 10, at 17-19.)

In his Reply, Petitioner has withdrawn Grounds For Relief One, Three, and Fourteen; they are not further analyzed herein.

## Ground Two for Relief

In his second Ground for Relief, Yarbrough contends he was denied his right to compulsory process under the Sixth Amendment and due process under the Fourteenth Amendment when the trial judge excluded from evidence a statement Calvin Davis made to Kenneth Henderson while both were incarcerated in November or December, 1994, that Tyrone McGhee, Jermaine Jelks, and Darren Taborn killed Wilma Arnett; the proffer occurs at Trial Transcript pp. 1675-1676. The Warden defends this claim on the merits without suggesting it is procedurally defaulted.

The State's theory of the case was that Calvin Davis, a Shelby County drug dealer under indictment on the basis of information provided by Wilma Arnett, hired Yarbough to kill her to prevent her testifying and also because she was attempting to get money from him to keep quiet. The defense offered Henderson's testimony to show that someone other than Yarbrough had done the killing.

Calvin Davis was dead by the time of trial, having died in prison in June, 1996. The defense offered Henderson's testimony under Ohio R. Evid. 804(B)(3) as having been made against Calvin Davis' penal interest. In affirming the trial judge's ruling on this point, the Ohio Supreme Court rejected that argument and also the argument that excluding the evidence violated Yarbrough's right to present a defense:

A. Evid.R. 804(B)(3)

[P62] Calvin Davis's statement that McGhee, Jelks, and Taborn killed Arnett was clearly not against Calvin Davis's penal interest. On the

-4-

other hand, his statement that McGhee, Jelks, and Taborn washed blood from themselves at Calvin Davis's house was against his penal interest, at least arguably. The statement could be construed as implying that he permitted the others to wash off the blood, which could be deemed to violate R.C. 2921.32(A), obstructing justice.

[P63]  However, the rule requires that the statement so far subjected him to criminal liability that a reasonable person would not make the statement unless true. *Issa*, 93 Ohio St.3d at 58, 752 N.E.2d 904. Appellant concedes that the statement represents an effort to shift blame to Taborn, McGhee, and Jelks. The evidence at trial shows that Calvin Davis was far more deeply involved in Arnett's murder than his statement to Henderson would suggest. A reasonable person might easily make a false statement that minimized his involvement in the offense. Compare *People v. Petros* (1993), 198 Mich. App. 401, 499 N.W.2d 784.

[P64]  Moreover, there is little to indicate that the statement is trustworthy. The sole corroborating circumstance is that Calvin Davis was not speaking to police and therefore was not trying to curry favor. However, while "jailhouse confessions to cellmates" may be "trustworthy and admissible," we cannot say the same of a statement that shifts blame from the declarant to others. (Emphasis added.) *Westmoreland*, 240 F.3d at 628.

[P65]  Appellant purports to find further corroboration in the facts that Henderson and Calvin Davis were discussing their cases, that Henderson knew Calvin Davis was in jail on drug charges, and that "prior indictments, convictions, or dismissals" were therefore a likely topic of conversation between them. Appellant offers no explanation of how these facts show the trustworthiness of Calvin Davis's statements. On balance, we find that the exclusion of Calvin Davis's statements comported with Evid.R. 804(B)(3).

B. Due Process

[P66]  Appellant further argues that, irrespective of whether the statements were admissible under Evid.R. 804(B)(3), their exclusion denied him due process of law. Here, appellant relies on *Chambers v. Mississippi* (1973), 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297. *Chambers* holds that due process "affords criminal defendants the right to introduce into evidence third parties' declarations against penal interest--their confessions--when the circumstances surrounding the statements 'provide considerable assurance of their reliability.' " *Lilly*, 527 U.S. 116, 130, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (plurality

opinion) (emphasis added), quoting *Chambers*, 410 U.S. at 300, 93 S. Ct. 1038, 35 L. Ed. 2d 297.

[P67]  In this case, the circumstances surrounding Calvin Davis's statements provide no assurances of reliability remotely comparable to those in *Chambers*. There, the declarant confessed to the murder, and his confession exonerated the defendant. *Chambers*, 410 U.S. at 297, 93 S. Ct. 1038, 35 L. Ed. 2d 297. But Calvin Davis's statements did not amount to a confession; he may have exposed himself to some liability, but he was accusing other people of killing Arnett. Furthermore, Calvin Davis's statements did not exonerate appellant; the possible involvement of three other persons in the murder hardly disproves appellant's guilt.

[P68]  In *Chambers*, the declarant's statement was corroborated both by the circumstances of its making and by other evidence. In this case, Calvin Davis's statements were corroborated to some extent by the circumstances of their making (in that they were not made to police), but not at all by other evidence. Finally, the *Chambers* declarant was available to be cross-examined. *Chambers*, 410 U.S. at 301, 93 S. Ct. 1038, 35 L. Ed. 2d 297. Calvin Davis was not.

> 2.  Although "the fact that other evidence corroborates the statement is irrelevant" to the Confrontation Clause analysis when the state attempts to introduce a statement against interest (*Madrigal*, 87 Ohio St.3d 378, 387, 721 N.E.2d 52), the same is not true when the defense attempts to introduce such a statement as a matter of due process. See *Chambers*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297; *Green v. Georgia,* 442 U.S. at 97, 99 S. Ct. 2150, 60 L. Ed. 2d 738.

[P69] "*Chambers* was an exercise in highly case-specific error correction." *Montana v. Egelhoff* (1996), 518 U.S. 37, 52, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (plurality opinion). The case "established no new principles of constitutional law" but "held quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." (Emphasis added.) *Egelhoff*, quoting *Chambers*, 410 U.S. at 302-303, 93 S. Ct. 1038, 35 L. Ed. 2d 297.

[P70]  The quite different "facts and circumstances" of this case call for a contrary result. Unlike the trial court in *Chambers*, the court here did not apply the hearsay rule "mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297.

Rather, the court applied the rule properly for its historic purpose: to exclude statements of dubious reliability that cannot be tested by cross-examination. Appellant's second proposition is overruled.

*State v. Yarbrough*, 95 Ohio St. 3d 227; 2002 Ohio 2126; 767 N.E.2d 216 (2002).

Petitioner spends seven pages (18-25) of his Reply arguing that the Ohio Supreme Court was wrong in its Evid. R. 804(B)(3) analysis. That argument is, however irrelevant. Federal habeas courts do not sit to correct errors of state evidentiary law. *Estelle v. McGuire*, 502 U.S. 62 (1991). . "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker,* 224 F. 3rd 542, 552 (6th Cir. 2000)(*quoting Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

Aside from the evidence rule argument, Petitioner does attempt to bring this evidence within *Chambers v. Mississippi* (Reply, Doc. No. 26, at 25-29.) However, he is unsuccessful in doing so: Davis' statement is simply not a confession of involvement in the murder of Wilma Arnett. As the Ohio Supreme Court noted, it is to some extent against penal interest in that, if the State had ever accused McGhee, Jelks, and Taborn of Arnett's murder or of any other crime[2] which would have gotten them bloody, he could have been accused of obstructing justice by letting them use his house to clean up. But to a man already in jail for serious drug charges and known to the authorities to have been involved in drug dealing for some time[3], the possibility of an obstructing justice charge would probably have seemed minor compared with the opportunity to exonerate himself by putting the blame on three others, two of whom shared his witness-elimination motive to have Arnett dead. It is true that

---

[2]Note that Henderson's testimony does not identify the date when these three allegedly washed up at Davis's house.

[3]Recall that it was the State's theory, adopted by the jury, that Davis had Arnett killed to prevent her testifying in a drug case pending in May, 1994, which was dismissed after her death.

the statement appears to have been relatively spontaneous – i.e., it was volunteered to Henderson rather than elicited by questioning. But spontaneity as a guarantee of trustworthiness disappears when the declarant's motive is more likely exculpatory than inculpatory. And of course Davis was not available for cross-examination as the declarant in *Chambers* was.

Because the Ohio Supreme Court decided on the merits the federal constitutional claim presented in this Ground for Relief, this Court reviews that decision under the deferential standard adopted by Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"). The Supreme Court has recently reiterated that standard as follows:

> The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas "retrials" and to ensure that state-court convictions are given effect to the extent possible under law. See *Williams v. Taylor,* 529 U.S. 362, 403-404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). To these ends, § 2254(d)(1) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

> As we stated in *Williams,* § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. 529 U.S., at 404-405, 120 S.Ct. 1495. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. *Id.,* at 405-406, 120 S. Ct. 1495. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. *Id.,* at 407-408, 120 S.Ct. 1495. The focus of the latter inquiry is on whether the state court's application of clearly established

> federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one. *Id.,* at 409- 410, 120 S.Ct. 1495. See also *id.,* at 411, 120 S.Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

*Bell v. Cone*, 535 U.S. 685, 693-94 (2002).

> AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] provides that, when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result. *Williams v. Taylor, supra,* at 405; *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) *(per curiam).* A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner. *Williams v. Taylor, supra,* at 405; *Woodford v. Visciotti,* 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) *(per curiam).*

*Brown v. Payton,* 544 U.S. 133, 134 (2005).

The Ohio Supreme Court's decision on this point is neither contrary to nor an objectively unreasonable application of the relevant U.S. Supreme Court decisional law, particularly *Chambers* and *Montana v. Egelhoff.* Yarbrough's second Ground for Relief is without merit.

**Ground Four for Relief**

In his Fourth Ground for Relief, Petitioner claims he suffered from prosecutorial misconduct "throughout his trial." Actually, the four asserted instances of misconduct all occurred in the prosecutor's closing argument.

1.    At one point the prosecutor told the jury that the defense was "flailing away" in coming up with other possible murderers for Wilma Arnett, but that the defense couldn't "explain away" the prosecution's evidence. (Reply, Doc. No. 26, at 34, citing Trial Tr. 1749-1750.) Petitioner argues this amounted to attempting to shift the burden of proof to the Petitioner. *Id.* at 33.

2.    At another point in the argument, the prosecutor told the jury that lack of evidence can itself be evidence. *Id.* at 34, citing Trial Tr. at 1752-1753. This argument is said to have encouraged the jury to convict even if the State had not proven every element of its case beyond a reasonable doubt. *Id.* at 33.

3.    At a third point in the argument, the prosecutor gave examples of situations from everyday life in which persons act despite having doubts and implicitly argued that the jury could find Yarbrough guilty even if it had doubts of this kind. *Id.* at 35, citing Trial Tr. at 1759. This argument is said to have mischaracterized the State's burden of proof. *Id.* at 33.

4.    Finally, the prosecutor is said to have misstated the evidence when he stated that Tonya Counts saw Yarbrough with Wilma Arnett the night of her death. *Id.* at 36-37, citing Trial Tr. at 1756-1757. This argument is said to have been "factually incorrect and [to have] misled the jury." *Id.* at 33.

**Procedural Default**

The Warden contends that Yarbrough's claim as to the first three of these comments is

procedurally defaulted because his counsel made no contemporaneous objection to the comments at trial (Return of Writ,Doc. No. 10, at 25-27.)  Petitioner contends that the claims are not procedurally defaulted (Reply, Doc. No. 26, at 35.)

The procedural default defense in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones,* 238 F. 3rd 399, 406 (6th Cir. 2000).  That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982).  Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107 (1982);  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  *Wainwright* replaced the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391 (1963).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001).

First the court must determine that there is a state procedural rule that

is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.

. . . .

Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin,* 785 F.2d, at 138.

Ohio has a contemporaneous objection rule, similar to that found in most jurisdictions, that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Glaros*, 170 Ohio St. 471, 166 N.E.2d 379 (1969), paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162, 694 N.E.2d 932 (1998). That rule was enforced as to these three claims of misconduct by limiting review to plain error:

A review of the record reveals that appellant failed to object to the first three claims of error. It is well established that in the absence of an objection, we limit our review of the prosecutor's comments to that standard established for plain error. *State v. McNeill (1998), 83 Ohio St. 3d 438, 446, 700 N.E.2d 596; State v. White (1998), 82 Ohio St. 3d 16, 22, 693 N.E.2d 772.*

*State v. Yarbrough*, 1999 Ohio App. LEXIS 1786 at *51 (Ohio App. 3rd Dist. March 31, 1999).

-12-

A state appellate court's review for plain error is enforcement, not waiver, of a procedural default. *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle,* 271 F. 3rd 239 (6th Cir. 2001), citing *Seymour v. Walker*, 224 F. 3rd 542, 557 (6th Cir. 2000)(plain error review does not constitute a waiver of procedural default); *accord, Mason v. Mitchell,* 320 F.3d 604 (6th Cir. 2003). Thus Yarbrough's procedural default in failing to contemporaneously object to these comments was enforced against him by the Court of Appeals.

Petitioner argues at some length that the contemporaneous objection rule is not an adequate and independent state ground of decision. (Reply, Doc. No. 26, at 43- 46). Sixth Circuit law is plainly to the contrary. *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Biros v. Bagley,* 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Cott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

The Warden's procedural default defense satisfies *Maupin, supra*. Therefore the first three claims of prosecutorial misconduct in Ground Four are procedurally defaulted and should be dismissed with prejudice.

**Merits Analysis**

Even though the first three claims of prosecutorial misconduct are procedurally defaulted, the fourth claim is concededly not. In the interest of completeness, the Magistrate Judge offers a merits analysis of all four claims.

On habeas corpus review, the standard to be applied to claims of prosecutorial misconduct

is whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process, *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright,* 477 U.S. 168 (1986); *Bates v. Bell*, 402 F.3d 635, 640-41 (6th Cir. 2005); *Kincade v. Sparkman*, 175 F.3d 444 (6th Cir. 1999) or whether it was "so egregious as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir. 1979); accord *Summitt v. Bordenkircher*, 608 F.2d 247 (6th Cir. 1979), *aff'd sub nom*, *Watkins v. Sowders*, 449 U.S. 341 (1981); *Stumbo v. Seabold*, 704 F.2d 910 (6th Cir. 1983). The court must first decide whether the complained-of conduct was in fact improper. *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), *citing United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). A four-factor test is then applicable to any conduct the Court finds inappropriate: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and whether the evidence against the defendant was strong." *Id.* The court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt. *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982). The court must examine the fairness of the trial, not the culpability of the prosecutor. *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993)(quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In *Serra*, the Sixth Circuit identified factors to be weighed in considering prosecutorial misconduct:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Id.,* at 1355-56 (quoting *Angel*, 682 F.2d at 608). The misconduct must be so gross as probably to

prejudice the defendant. *Prichett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997), *cert. denied*, 118 S. Ct. 572 (1997); *United States v. Ashworth,* 836 F.2d 260, 267 (6th Cir. 1988). Claims of prosecutorial misconduct are reviewed deferentially on habeas review. *Thompkins v. Berghuis,* 547 F.3d 572 (6th Cir. 2008), citing *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

It is noteworthy that all four claimed instances of misconduct occurred during closing argument as opposed to any other time during the trial. Counsel, of course, are traditionally given more leeway in making closing arguments than at other times during the trial.

With respect to two of the prosecutor's comments, the Magistrate Judge finds Yarbrough's claim of misconduct is not even colorable. The first claim is that somehow the prosecutor shifted the burden of proof by pointing out that the defense was "flailing" in trying to explain away the prosecution's evidence. Yarbrough makes the black-letter law point that "[u]nder the Fifth Amendment to the United States Constitution, it is not up to the defense to 'explain away' the evidence." (Reply, Doc. No. 26, at 34). Of course that is true, but hardly decisive. When a prosecutor has presented strong evidence, effective defense counsel will surely attempt to explain it away if they can. When they have tried to do so, as was apparently the case here, the prosecutor is completely within the law and his ethical obligations to try to persuade the jury that the attempted explanations are not persuasive. In short, this is nothing like a prosecutor's commenting on a defendant's silence, which would of course be a matter of misconduct.

The second complained-of comment is the prosecutor's statement "Now sometimes the lack of evidence can also be evidence. . . These kind [sic] of crimes, premeditated murder, murder for hire do not lend themselves to a lot of evidence." (Trial Tr. at 1752-1753, quoted at Reply, Doc. No. 26, at 34). Yarbrough argues:

> It was improper for the State to argue that Petitioner was guilty

> because no physical evidence linked him to the crime scene.  The fact
> that no footprints or shoeprints, no blood, or any eyewitnesses linked
> him to the scene did not constitute evidence of his guilt.  The State's
> argument turned the presumption of evidence upside down.

*Id.* at 34-35.  It is of course true that the lack of physical evidence did little or nothing to identify

Yarbrough as the killer.[4]  However, the argument is completely relevant to the State's theory that the

murder was committed by someone for hire and by someone who planned it.  The sorts of physical

evidence or eyewitnesses available for murders committed in a passion are less likely, as a matter of

common sense, to be available when the murder has been planned: emotional killers are less likely to

be careful about physical evidence than calculating killers.  There is simply no misconduct in the

prosecutor's having made this argument.

The prosecutor's examples of reasonable doubt in everyday life are more troubling.  He argued

that people fly even though planes crash and drive despite the possibility of automobile accidents and

"dress or plan our activities based upon weather forecasts even though those may prove to be wrong."

(Trial Tr. at 1759).  This suggests that the question of whether the State has proven guilt beyond a

reasonable doubt can be made by the jury with only the level of deliberation people ordinarily put into

whether to drive or fly or take an umbrella.

A State may not define "beyond a reasonable doubt" in such a way as to reduce the actual

quantum of proof necessary to convict.  *Cage v. Louisiana,* 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed.

2d 339 (1990)(disapproving "moral certainty" when coupled with language that jurors needed an

"actual substantial doubt" or a "grave uncertainty"); compare *Victor v. Nebraska*, 511 U.S.

1(1994)("moral certainty" acceptable when combined with "abiding certainty.")  In *Thomas v. Arn,*

704 F.2d 865 (6th Cir. 1983), the court upheld the "willing to act" language in the Ohio statute;

---

[4]Of course, Yarbrough's semen was found in Arnett's dead body.

*Accord, Buell v. Mitchell,* 274 F. 3ʳᵈ 337 (6ᵗʰ Cir. 2001); *Byrd v. Collins,* 209 F.3d 486 (6ᵗʰ Cir. 2000); *Scott v. Mitchell*, 209 F.3d 854 (6ᵗʰ Cir. 2000). However, that language is coupled with "in the most important of the person's affairs." Ohio Rev. Code § 2901.05(E). While risking one's life by flying or driving is important, the statistical risk of death on any one occasion is so low (at least so far as the person knows when making the decision to fly or drive) that the decider cannot calculate the risk on any particular occasion. The risk of being wrong in not taking an umbrella approaches insignificance.

While the examples chosen by the prosecutor are inappropriate, no challenge is made to the actual jury instruction which followed Ohio law. The jury is presumed to follow instructions from the trial judge and that instruction, given in the terms of Ohio Rev. Code § 2901.05, would have corrected any misimpression left by the prosecutor. And while these remarks were an inaccurate statement of the law, they were not extensive and may not have been deliberately misleading. Petitioner is not entitled to relief on the third claimed instance of misconduct.

The fourth claimed instance of prosecutorial misconduct occurred when the prosecutor argued to the jury "Yarbrough denies to Joanie Henry being with Wilma that night; and yet we have him seen by Tonya Counts . . ." (Trial Tr. at 1756-1757). Petitioner contends "This argument was improper because Counts could not positively identify Petitioner as the man she saw with Arnett the evening before Arnett was killed." (Reply, Doc. No. 26, at 37.)

The Warden concedes that this claim is preserved for consideration on the merits. The Court of Appeals recited the relevant evidence as follows:

> On May 9, 1994, the day before Arnett's body was discovered, Tanya Counts, a cashier at a Speedway gas station, observed Arnett three times throughout the evening. Counts was working the 4:00 p.m. to closing shift. Counts testified that the store usually closed around 10:00 or 11:00 at night. Close to the end of Counts's shift, Arnett returned to the store for the last time that evening to purchase gas. After pumping

-17-

the gas, Counts observed Arnett return to her car. According to Counts, a tall black male with a "bump" on his eye paid for the gas. It was established at trial that appellant, at the time of Arnett's death, had a large cyst under his right eye. Counts testified that the location of the cyst in a photograph of appellant shown at the trial was in the same place as the cyst on the person she saw with Arnett on the night of the 9th of May, 1994. Counts also testified that the photograph of appellant looked like the same person she saw on the evening of the 9th of May, 1994.

*State v. Yarbrough*, 1999 Ohio App. LEXIS 1786 at *5-6 (Ohio App. 3rd Dist. March 31, 1999).

In considering this claim, the Ohio Supreme Court found no impropriety at all[5]:

> [**P119] In the guilt phase, the prosecutor argues that appellant was "seen by Tanya Counts" with Arnett. Appellant's objection was overruled. Appellant claims the argument was improper because Counts did not identify him as the man she saw with Arnett.

> [**P120] However, the prosecutor neither said nor implied that Counts actually identified appellant. Counts testified that the man had a "bump" on his face in the same place as appellant's. And, she added, appellant's photograph looked like the same man. From this evidence, it was reasonable to infer that appellant was the man whom Counts saw with Arnett. A prosecutor is entitled to draw reasonable inferences from the evidence. *See, e.g., State v. Waddy* (1992), 63 Ohio St.3d 424, 436, 588 N.E.2d 819.

*State v. Yarbrough*, 95 Ohio St. 3d 227; 2002 Ohio 2126; 767 N.E.2d 216 (2002). The court had specifically noted that Counts could not positively identify Yarbrough. *Id.* at ¶ 13.

Yarbrough overstates his case when he claims "The State also told the jury that Counts had positively identified Petitioner. . . ." The record does not reflect any such claim. However, because Yarbrough is a tall black man who had a noticeable "bump" on his face on the night of the murder and

---

[5] The Court of Appeals had found that the comment was improper but did not result in an unfair trial. *State v. Yarbrough*, 1999 Ohio App. LEXIS 1786 at *53 (Ohio App. 3rd Dist. March 31, 1999). In reviewing the claim, it is the last explained state court decision that this Court is to consider. *Joseph v. Coyle,* 469 F.3d 441, 450 (6th Cir. 2006); *Couch v. Jabe,* 951 F.2d 94, 96 (6th Cir. 1991).

Counts testified the appellant's photograph "looked like the same man," it was a fair inference to say that Counts saw Yarbrough at the gas station where she had also seen Arnett three times that night. It would have been more accurate for the prosecutor to says to the jury that it could infer the identification, but what the prosecutor said was not a misstatement of the evidence. "It is improper for a prosecutor, during closing arguments, to bring to the attention of the jury any 'purported facts that are not in evidence and are prejudicial,'" *Byrd v. Collins*, 209 F. 3d 486, 535, quoting *United States v. Wiedyk,* 71 F. 3rd 602, 610 (6th Cir. 1995)(citing *United States v. Leon,* 534 F. 2nd 667, 679 (6th Cir. 1976). "However, prosecutors 'must be given leeway to argue reasonable inferences from the evidence.'" *Byrd v. Collins*, 209 F. 3rd 486, 535, quoting *United States v. Collins*, 78 F. 3rd 1021, 1040 (6th Cir. 1996); *see also Esparza v. Mitchell*, 310 F.3d 414 (6th Cir. 2002), citing *United States v. Young*, 470 U.S. 1, 11-12 (1985). The Ohio Supreme Court's decision on this point is neither contrary to nor and unreasonable application of clearly established Supreme Court precedent. Petitioner's Fourth Ground for Relief is without merit.

## Ground Five for Relief: Sufficiency of the Evidence

In his fifth Ground for Relief, Petitioner asserts he was convicted on insufficient evidence. The Warden suggests no procedural bar to our merit consideration of this claim. The Supreme Court of Ohio decided this claim on the merits, so AEDPA deferential review is appropriate. That court held:

> [**P71]  In his fourteenth proposition, appellant contends that the evidence was insufficient to convict him.
>
> [**P72]  The state's evidence showed that Calvin Davis wanted Arnett dead and that he had brought appellant to Shelby County no more than a week before her murder. Arnett was last seen alive late in the evening on May 9, and appellant returned to Georgia the very next morning. He traveled under false names, carried no identification during his Ohio

sojourn, and went out of his way to avoid the Sidney bus station.

[**P73] Jelks was present when Calvin Davis proposed that he and McGhee pay appellant to "hit" Arnett "so [their] drug cases would get dropped." Jelks saw McGhee give appellant $ 10,000 in a duffel bag, and he watched appellant count it. Calvin Davis told his wife that he had paid appellant $ 5,000.

[**P74] Appellant had a large cyst near his eye. On the night of the murder, one witness saw a black man with a "mole" or "knot" near his eye carrying a pistol. Another saw Arnett that night in the company of a black man with a "bump" near his eye.

[**P75] Later that night, McGhee was present when appellant described the murder to Calvin Davis. According to McGhee, appellant also told Calvin Davis that he "threw the gun up there in the woods" near the home of Calvin Davis's nephew. A .38-caliber pistol was later found in that vicinity; two witnesses identified that gun as belonging to Calvin Davis. Jewel Davis testified that Calvin Davis gave that gun to appellant. Calvin Davis's gun was .38-caliber; so was the bullet removed from Arnett's corpse.

[**P76] Appellant also mentioned "the window being broke out" of Arnett's car, McGhee testified. Arnett's car had a broken window when her husband found it on the morning of May 10, and broken glass was found near Arnett's body.

[**P77] Appellant was identified as the source of semen found on a vaginal swab taken during Arnett's autopsy. After initially denying to a detective that he knew Arnett, appellant eventually admitted that he had had sexual relations with her.

[**P78] On sufficiency-of-the-evidence review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560.

[**P79] Appellant argues that the testimony implicating him was "contradictory and incredible." However, this contention calls for an evaluation of the witnesses' credibility, which--as we have repeatedly pointed out--is not proper on review for evidentiary sufficiency. See, e.g., *State v. Murphy (*2001*)*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765; *State v. Waddy (*1992*)*, 63 Ohio St.3d 424, 430, 588 N.E.2d 819; *State v. DeHass (*1967*)*, 10 Ohio St.2d 230, 39 Ohio Op. 2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

[**P80] Appellant contends that we should not consider Calvin Davis's statements in this sufficiency review because, as appellant

claims in his first proposition, they were inadmissible hearsay. He is mistaken. The statements were properly admitted, and on a claim of insufficient evidence, the reviewing court considers all the evidence admitted against the appellant at trial. See *Lockhart v. Nelson* (1988), 488 U.S. 33, 40-42, 109 S. Ct. 285, 102 L. Ed. 2d 265.

[**P81] Appellant further claims that there was insufficient evidence that the murder was committed for hire. But this ignores Jelks's testimony. Jelks not only heard the conversation in which Calvin Davis hired appellant to kill Arnett, he actually saw McGhee pay his portion in cash.

[**P82] The evidence, if believed, proves that appellant killed Arnett, that he did so to prevent her testimony against Calvin Davis's drug ring, and that he did so for hire. Appellant's fourteenth proposition of law is therefore overruled.

*State v. Yarbrough*, 95 Ohio St. 3d 227; 2002 Ohio 2126; 767 N.E.2d 216 (2002).

In seeking to overturn this conclusion, Yarbrough argues there was much contradictory evidence. He claims there was no physical evidence of his involvement (Return, Doc. No. 26, at 49), failing to mention his sperm found in the decedent's body. He notes that key state witnesses were inconsistent and biased. *Id.* He notes that several persons in Shelby County had a motive to murder Arnett for her snitching, but claims that "as an outsider from Georgia, [he] did not." *Id.* This fails to mention the evidence about his prior acquaintance with Calvin Davis as a "gypsy" painter, how he got to Shelby County, testimony about the payment of cash to him for the murder, and the fact that – for no obvious innocent reason – he returned to Georgia the day after the murder.

The test under *Jackson v. Virginia* does not weigh the contradictory evidence or bias of witnesses. Instead,

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307 at 319 (1979); *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007). This is the test which the Ohio Supreme Court applied. Its conclusion that there was sufficient evidence is not an unreasonable application of *Jackson*. Yarbrough's fifth Ground for Relief is without merit.

### Ground Six: Ineffective Assistance of Trial Counsel

In his Sixth Ground for Relief, Petitioner asserts his counsel were ineffective for failure to conduct an adequate *voir dire* inquiry into possible racial bias of jurors[6], given that he was a black man on trial for filling a white woman (Return of Writ, Doc. No. 26, at 58-66). The Warden concedes this claim is preserved for merit review.

In deciding this claim, the Ohio Supreme Court held:

> [**P139] Ineffective assistance claims are governed by a two-part test. To prevail, the defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) resulting prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. See *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 104 S. Ct. 2052, 80 L. Ed. 2d 674; *Williams v. Taylor* (2000), 529 U.S. 362, 390-391, 120 S. Ct. 1495, 146 L. Ed. 2d 389; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

> [**P140] First, appellant contends that, since this case involved a white victim and black defendant, his counsel should have questioned veniremen on their racial attitudes *during individual, sequestered voir dire*. Counsel did question the panel about racial attitudes during general voir dire. However, appellant argues that this topic is so sensitive that jurors will not answer questions about it honestly in the presence of other veniremen.

> [**P141] However, appellant ignores the fact that his counsel

---

[6]Part of what was originally in this claim is argued under Ground Eight and a third sub-part has been withdrawn.

> requested individual, sequestered voir dire, and the trial court denied the motion. Consequently, appellant's counsel did not have the opportunity to query jurors in sequestration with regard to subjects other than pretrial publicity and death-qualification. Counsel can hardly be blamed for following a procedure ordered by the trial court.

*State v. Yarbrough*, 95 Ohio St. 3d 227; 2002 Ohio 2126; 767 N.E.2d 216 (2002)(emphasis sic).

Petitioner makes a long argument about the possible pernicious effects of racial bias in a criminal trial, particularly with a black male defendant and a white female victim. However, his current counsel fail to confront the question put by the Ohio Supreme Court: how could counsel conduct an individualized sequestered voir dire on this topic when the trial court had forbidden such an inquiry? It simply cannot be ineffective assistance of counsel to follow a trial court's procedural order[7].

Apart from that observation is the whole question of prejudice. To prevail on a *Strickland* claim, a habeas petitioner must show that he was prejudiced by his counsel's deficiency. Here the entire prejudice prong is ignored or, worse, supposed. Petitioner's counsel asks us to presume that an all-white jury in Shelby County, Ohio, was racially prejudiced. There is simply no proof to that effect beyond the presumption, which this Court should not indulge.

The Ohio Supreme Court's application of *Strickland* was not objectively unreasonable. The Sixth Ground for Relief should be denied.

## Ground Seven: Ineffective Assistance of Trial Counsel

In his seventh Ground for Relief, Petitioner contends he received ineffective assistance of

---

[7]It is, of course, a separate question whether the trial judge's denial of an individualized, sequestered voir dire on this topic was itself error, but no such claim is made.

counsel in that his counsel did not use a transcript of Detective Joanie Henry's interview with Jermaine Jelks to impeach any witness (Reply, Doc. No. 26, at 69). Later, he seems to claim that defense counsel should have actually called the investigating deputy sheriff to testify. *Id.* at 71; see also p. 72 ("Failure to proffer Det. Henry's statement, or to call Det. Henry as a witness in support of Henderson's testimony, violated Petitioner's right to effectively litigate in favor of admission of Henderson's statement.")

The Warden contends this claim is procedurally defaulted because it could have been raised on direct appeal but was never raised until Petitioner's post-conviction relief petition (Return, Doc. No. 10, at 28). The Warden is correct that the Shelby County Common Pleas Court dismissed these claims as barred by *res judicata* on the theory they could have been heard on direct appeal and the Shelby County Court of Appeals affirmed on that basis. Yarbrough responds that the state courts were in error in finding *res judicata* because the relevant document was not in the record on direct appeal and was in fact expressly excluded from the record despite motion practice intended to have it included (See discussion in Reply, Doc. No. 26, at 85-87.) The Warden makes no response to this argument in his Surreply (Doc. No. 31).

When the record reveals that the state court's reliance on its own rule of procedural default is misplaced, federal habeas review is not be precluded. *White v. Mitchell*, 431 F.3d 517, 527 (6th Cir. 2005), *citing Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005); *Greer v. Mitchell,* 264 F.3d 663, 675 (6th Cir. 2001). The Court concludes this claim is not procedurally defaulted and reaches its merits without any AEDPA deference since the state courts did not decide the issue on the merits.

On the merits, however, the Magistrate Judge finds the claim lacking. Yarbrough's argument

is that, if Henry had been called to testify[8] and had repeated what Calvin Davis said to her about Tyrone McGhee, Jermaine Jelks, and Darren Taborn coming to his home on the morning of May 10, 1994, to wash off blood, that would have sufficiently corroborated Kenneth Henderson's testimony that Calvin Davis said the same thing to him to have allowed the Henderson testimony to be admitted.

This argument misses the true point of the exclusion of Henderson's recount of what Davis told him: Davis' statement to Henderson and his parallel statement to Henry were exculpatory, not inculpatory. (See analysis, supra, under Ground Two.) Because it is unlikely Henry's statement would have persuaded the trial judge or the appellate judges that Davis' statement was inculpatory, failure to offer it was neither deficient performance nor shown to be prejudicial.

The Seventh Ground for Relief is without merit.

## Eighth Ground for Relief: Ineffective Assistance of Trial Counsel

In his Eighth Ground for Relief, Yarbrough claims he received ineffective assistance of trial counsel in that his trial attorneys failed to effectively cross-examine Jermaine Jelks so as to expose the ways in which his story changed over time (Reply, Doc. No. 26, at 73-76). The Warden concedes that this claim is preserved for merit review because the state courts' *res judicata* decision on this claim was in error (Return of Writ, Doc. No. 10, at 70). However, he notes that the court of appeals rendered an alternative decision on the merits as follows:

> In his fourth, fifth, and sixth claims for relief, the appellant asserts that he is entitled to an evidentiary hearing on the basis that trial counsel rendered ineffective assistance of counsel in failing to properly

---

[8]Henry's report in this regard was hearsay. It might have been admissible despite that fact under the "offered by the defendant" exception to the exclusion of police reports in criminal cases under Ohio R. Evid. 803(8).

confront, cross-examine, and impeach three witnesses for the prosecution. The appellant maintains that the testimony of Jermaine Jelks, Annette Simmons, and Jewel Davis was inconsistent with previous statements they had given to the police. The appellant asserts that the witnesses should have been properly cross-examined at trial regarding their prior inconsistent statements. In support of these claims, the appellant attached to the petition the transcripts of the police interviews conducted with each of the witnesses.

As to the charge that trial counsel's cross-examination of these witnesses was substandard, we note that an appellate court reviewing an ineffective assistance of counsel claim will not second-guess counsel's strategy in direct and cross-examination of witnesses. *State v. Gray* (Mar. 28, 2000), 2000 Ohio App. LEXIS 1239, Franklin App. No. 99AP-666, unreported, citing *State v. Edwards* (Feb. 17, 1998), 1998 Ohio App. LEXIS 528, Clermont App. No. CA97-04-035, unreported. Furthermore, as we previously stated, debatable tactical decisions generally do not constitute a deprivation of effective counsel. *State v. Phillips* (1995), 74 Ohio St. 3d 72, 85, 656 N.E.2d 643.

*State v. Yarbough.* 2001 Ohio 2351; 2001 Ohio App. LEXIS 1930 at *16-18 (Ohio App. 3rd Dist. April 30, 2001).

Without doubt, Jermaine Jelks testimony was harmful to Yarbrough, as Jelks testified at trial in 1997 that he was present when Petitioner was paid by Davis for the hit on Arnett. On February 13, 1996, in response to Detective Henry's statement that Davis had named him, McGhee, and Taborn as the killers, he denied it, claiming (consistent with his trial testimony) that "Petitioner killed Wilma and Bussey drove the car." (Quoted at Reply, Doc. No. 26, at 73.) This is alleged to be inconsistent with the trial testimony because he did not at that time mention the payment in the van incident. On August 13, 1996 (after Calvin Davis' death in prison in June, 1996), Jelks told authorities the van story, but put the date of the incident several months before the murder, at a time when Yarbrough was not in Shelby County. Habeas counsel argues that trial counsel "did not put before the jury that Jelks did not start pointing the finger at anyone until he was a suspect." *Id.* at 73-74.

It is doubtful these "inconsistencies" would have had much impact on the jury. The prosecutor

would probably have asked the jury the rhetorical question: "How many drug dealers go to the police to name other drug dealers as murderers when they themselves are not under suspicion, especially if the other dealer in question has just had a witness killed?" After Calvin was dead, snitching on him that he paid Yarbrough would no longer have endangered Jelks' life. In this Court's experience, cross-examiners, regardless of who they represent, often become far more excited about supposed inconsistencies than finders of fact are likely to be.

In light of the likely impact on the jury, the Court finds the Shelby County Court of Appeals decision is not an objectively unreasonable application of *Strickland*. Defense counsel did not fail to cross-examine Jelks altogether, as was true in many of the cases cited by Petitioner. They sent their investigator to interview him and cross-examined him based on his statement to the investigator. The Court of Appeals refusal to review the extent of cross-examination with 20/20 hindsight is consistent with the Supreme Court's warning in *Strickland* that such perfect hindsight is not appropriate in reviewing counsel's performance. And of course we do not know why trial counsel did not cross-examine Jelks from the police interview because Petitioner was denied an evidentiary hearing in state court and never sought one here.

Petitioner's Eighth Ground for Relief should be denied.


### Ninth Ground for Relief: Ineffective Assistance of Counsel


In his Ninth Ground for Relief, Petitioner claims he received ineffective assistance of trial counsel in the manner in which his counsel cross-examined Annette Simmons (Reply, Doc. No. 26, at 76-79). The Court of Appeals decided this claim on the merits in the portion of its decision quoted under Ground Eight above. Here, as with Jelks, trial counsel did cross-examine Simmons.

Yarbrough's present critique is that they did not put enough effort into exposing "contradictions" – actually more a matter of parts of the story told at one time but omitted in other tellings.

There can be a myriad of good tactical reasons not to spend a great deal of time on exposing differences between how a witness has told a story on one occasion and how she tells it on another. Juries are frequently instructed that such inconsistencies are not uncommon in human narrative. Beyond that, a sense for the courtroom dynamics can caution against spending too much time with a particular witness. Finally, going over the story a number of times can reinforce in a jury's mind the portions of the story which do not change.

As with the Eighth Ground for Relief, the Magistrate Judge concludes the Shelby County Court of Appeals refusal to evaluate the scope of the cross-examination of Ms. Simmons with the hindsight available post-trial is not an objectively unreasonable application of *Strickland*. The Ninth Ground for Relief should be denied.

## Tenth Ground for Relief: Ineffective Assistance of Trial Counsel

The Tenth Ground for Relief is another critique of trial cross-examination, this time of Jewel Davis, Calvin Davis' wife at the time of the murder and widow by the time of trial. The same analysis applied above to deny Grounds Eight and Nine also renders this claim without merit.

## Eleventh Ground for Relief: Ineffective Assistance of Trial Counsel

The Eleventh Ground for Relief claims trial counsel were ineffective for failure to present exculpatory evidence. However, the only specific evidence pointed to is the post-conviction Affidavit

of Elizabeth Johnson who claims James Bussey admitted to her that he "and others" set Petitioner up to be convicted of the murder.

Elizabeth Johnson actually submitted three separate affidavits, all sworn to on June 12, 1998, before the same notary in Richmond County, Georgia. Read together, they state that Johnson became Yarbrough's cohabiting girlfriend shortly after they met in April, 1994, the month before the murder. They had a "very open and loving relationship" which only resulted in one charge of assault against Yarbough for a fight on New Year's Day, 1995. Johnson says Yarbrough was a regular user of crack cocaine, but not a violent one who would rob others for money to pay for drugs. One day when she and Yarbrough were in bed together he noticed Calvin Davis' name in her address book. Inquiring how she knew Davis, Yarbrough was told Davis was her husband's cousin.

3.    Upon this discovery, Kevin and I decided to phone Calvin in Sidney, Ohio. Kevin spoke with Calvin on the phone that day. Through their conversation, Calvin discovered that Kevin was not working at that time. Calvin invited Kevin and myself up to help him sell drugs in Sidney for one week to earn some extra money. Kevin agreed to travel to Sidney to work for Calvin in his drug business but I was not able to travel with him because I had a doctor's appointment that week.

4.    Calvin forwarded Kevin a bus ticket and twenty dollars in spending money for the trip. The bus ticket was in my name because Kevin did not have a driver's license.

5.    Prior to Kevin's return, I learned that Wilma Arnett was murdered. I received this information from Annette Simmons over the telephone.

6.    I contacted the Shelby County Police Department after the murder to find out if a warrant had been issued for Kevin's arrest. I spoke with Detective Clark at that time. He informed me that a warrant had not been issued. I did not give the police department my name during this conversation.

21.    Before I even met Kevin, I spoke with Calvin Davis about his drug trafficking charges. During that conversation, he told me that Wilma Arnett, his sister-in-law, was the drug informant

> working for the State. He also told me that he previously paid
> her money to get her out of his life, but she would not leave.
> He played his answering machine for me which detailed a prior
> conversation he had with Wilma Arnett. In that conversation,
> Wilma asked for additional money from Calvin in order for her
> to leave the area before his trial. In response to this
> conversation, Calvin told me that he will kill her or have her
> killed before he giving her any more money. I have a tape of
> this conversation in my possession.

(Return of Writ, Doc. No. 10, Ex. W.)  This affidavit, presumably constructed with the assistance of

Petitioner's counsel, would likely have been interesting to the Shelby County Sheriff in 1995.

Detective Henry might well have asked why Arnette Simmons would have called Ms. Johnson to

inform her about Arnett's murder and why that would have led Johnson to call Shelby County to find

out if there was a warrant out for Yarbrough's arrest.  And why would Calvin Davis tell her he would

have Wilma Arnett killed rather than paying her more money?  The Affidavit suggests that Elizabeth

Johnson knows a great deal more about drug dealing in Shelby County, Ohio, and the murder of Wilma

Arnett than she tells in these affidavits.

Against the background of Exhibits V and W, Exhibit X, on which Petitioner relies, is quite

short.  The first paragraph repeats how the Johnson-Yarbrough relationship was formed.  The second

reads:

> 2.     After Kevin's conviction for Wilma Arnett's murder, I was
> driving James Bussey and his daughter home from a family
> gathering. We began to .talk about Kevin's conviction. James
> Bussey told me that he could not believe how stupid that
> motherfucker really was. He then went on to tell me that we
> got away with it. I immediately questioned James about his
> statement, but he then denied making the statement.

(Return of Writ, Doc. No. 10, Ex. X.)  Ms. Johnson does not say when this conversation actually

happened.

The gravamen of the Eleventh Ground for Relief appears to be that if defense counsel had just

worked harder, Bussey would have made this admission to them before Yarbrough's trial and would have been willing to repeat it on the witness stand, along with other details which would have shown that Bussey himself was involved in the murder or at least in a post-murder scheme to frame Yarbrough. In addition, defense counsel would have discovered other unspecified exculpatory evidence.

These claims have no colorable merit at all. The Eleventh Ground for Relief should be denied.

## Twelfth Ground for Relief: Violation of *Brady v. Maryland*

In his Twelfth Ground for Relief, Petitioner claims the State withheld impeachment information regarding witness Vance Short which should have been disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963). This claim was raised for the first time in post-conviction but is concededly preserved for merit review in this Court.

In deciding this claim, the Shelby County Court of Appeals wrote:

> In his eighth claim for relief, the appellant asserts that he is entitled to a new trial or, at a minimum, that he be allowed the opportunity for discovery and an evidentiary hearing on the basis that the prosecution withheld exculpatory evidence at trial. The appellant maintains that the prosecution should have disclosed to defense counsel that Vance Short, a witness for the prosecution, was given a deal in exchange for his testimony. In support of his claim, the appellant attached to his petition a letter Vance Short had written to an attorney in which he claims that his cooperation with the prosecution is grounds for a possible sentence reduction. [5]
>
> 5 Vance Short testified at trial that while incarcerated in the Shelby County jail with the appellant, the appellant told him that "I made sure the bitch got what she deserved."

The law of this state requires a prosecuting attorney, upon motion of the defendant before trial, to disclose to the defendant all known evidence "favorable to the defendant and material to either guilt or punishment." *Crim.R. 16(B)(1)(f)*. When the prosecution withholds material, exculpatory evidence in a criminal proceeding, it violates the defendant's due process right to a fair trial under the Fourteenth Amendment. "The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." *Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194; see, also, *State v. Johnston* (1988), 39 Ohio St. 3d 48, 529 N.E.2d 898, paragraph four of the syllabus. When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule. *Giglio v. United States* (1972), 405 U.S. 150, 154, 31 L. Ed. 2d 104, 92 S. Ct. 763, citing *Napue v. Illinois* (1959), 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173.

In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally, or not at all requested by the defense. *Johnston*, 39 Ohio St. 3d at paragraph five of the syllabus, following *United States v. Bagley* (1984), 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375; see, also, *Kyles v. Whitley* (1995), 514 U.S. 419, 131 L. Ed. 2d 490, 115 S. Ct. 1555.

Here, the appellant relies heavily on the written letter to bolster his position that there had been a sentence reduction deal which was known in advance of trial and should have been disclosed to the defense. There is nothing in the letter, however, which suggests that a reduction in sentence was promised in exchange for his testimony. While it is certainly possible that Vance Short may have inquired as to the possibility of reducing his sentence before he testified at the appellant's trial, nothing in the record supports that anything definitive was promised that required disclosure.

*State v. Yarbrough,* 2001 Ohio 2351; 2001 Ohio App. LEXIS 1930 (Ohio App. 3rd Dist. Apr. 30, 2001).

Because the state courts decided the federal constitutional question on the merits, AEDPA deference is required. Petitioner asserts both (1) that the Court of Appeals decision is contrary to or an unreasonable application of clearly established federal law and (2) that its conclusion that the exhibits submitted in post-conviction did not establish a tacit agreement to give Short lenience for his testimony is "an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." (Reply, Doc. No. 26, at 103.)

With respect to the second branch of that argument, Yarbrough argues that he presented in post-conviction all the evidence that was available to him and was denied discovery and an evidentiary hearing in the state courts. *Id.* at 103-104. However, Petitioner also never sought either discovery or an evidentiary hearing in this Court (See Entry Regarding Scheduling, Doc. No. 21, and compare subsequent docket entries.) To the extent Petitioner has or could have obtained in this proceeding additional evidence of an agreement between Short and the State, he has foregone any opportunity to do so. In other words, this Court is limited to deciding this Ground for Relief on the state court record because Petitioner did not seek to add to that record.

The evidence which is relied upon is an April 16, 1996, letter to Attorney William Zimmerman seeking to retain him to seek a sentence reduction based on his cooperation in the Arnett murder investigation. He refers to a letter to the Parole Board from Detective Henry supporting his unsuccessful request for shock parole and hypothesizes that a similar letter might be forthcoming, if requested, to support a sentence reduction. The letter is unauthenticated. As the Court of Appeals concluded, there is nothing in the letter which even suggests that Short was promised anything for his testimony, but merely that he was rewarded for his testimony with an unsuccessful letter from a detective over which the Parole Board paused for less than a minute. Based on the evidence presented, the Court of Appeals did not reach a conclusion which was unreasonable.

Nor is the Court of Appeals opinion an objectively unreasonable application of *Brady* and its progeny. Neither the Court of Appeals nor the Warden in his filings is suggesting that an agreement must be in writing to be discloseable under *Brady*. An oral agreement or even a tacit agreement would be required to be disclosed. But that is not what is shown here by the evidence.

There is also a serious question whether if there were undisclosed evidence of an agreement between the State and Short (evidence which is still undisclosed to this Court) it would have been material in the sense required. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 683 (1985). If we suppose that there was a deal and its disclosure would have so completely discredited Short that the jury would have disbelieved his testimony that Yarbrough told him "the bitch got what she deserved," it is very unlikely this would have changed the result. Other testimony to the same effect came from other witnesses, including a statement made by Yarbrough to Calvin Davis on the day of the murder that Arnett got what she deserved.

The Twelfth Ground for Relief should therefore be denied.

### Thirteenth Ground for Relief: Violation of *Brady v. Maryland*

In his Thirteenth Ground for Relief, Yarbrough claims the State withheld material impeachment evidence regarding Jermaine Jelks (Reply, Doc. No. 26, at 106).

### 1.     Orande Clark Statement

At trial Jelks testified that he had a jailhouse conversation with James Bussey in which Bussey told Jelks "we killed her," allegedly referring to himself and Petitioner. Another inmate, Orande Clark, is said to have been present during the conversation and to have later told Detective Schlagetter that Bussey did not admit any involvement in Arnett's murder. Petitioner claims that the State never disclosed either the fact of the Clark interview or its contents. *Id.* at 106-107.

Proof of the existence of Clark's statement is by way of a November 29, 1999, Affidavit of Richard Mayhall, James Bussey's trial attorney on his charges arising out of the murder of Wilma Arnett. In pertinent part the affidavit reads:

> 2. In February, 1996, I was appointed by Judge Schmitt to represent James Bussey in his aggravated murder trial.
>
> 3. On December 19, 1996, my investigator, Anthony Bentley and I interviewed Orande Clark at the London Correctional Institute. According to Jermaine Jelks, Mr. Clark was present in the Shelby County Jail with Jermaine Jelks when Mr. Bussey confessed that he was involved in the shooting of Wilma Arnett. The State of Ohio planned to call Jermaine Jelks to testify to this conversation.
>
> 4. During our interview with Mr. Clark, he informed us that Mr. Bussey did not make a statement inculpating himself to the crime. Mr. Clark further informed us as to the exact details of the conversation that took place that day. According to Mr. Clark, several men, including James Bussey and Jermaine Jelks, were sitting around a table. Mr. Jelks began to talk about the murder. He first stated that if he knew who killed Wilma Arnett he would tell. He said jokingly that he was going to say something to get his time reduced. Mr. Jelks then turned to Mr. Bussey and said "I bet you killed her." Mr. Bussey told Mr. Jelks not to even joke like that.
>
> 5. Mr. Clark also informed us that Detective Schlagetter of the Shelby County Police came to speak with him regarding the crime. Detective Schlagetter offered to reduce Mr. Clark's sentence if he provided them with information. Mr. Clark, however, informed the detective that he did not know anything about the murder of Wilma Arnett. Detective Schlagetter then proceeded to question Mr. Clark about the conversation that allegedly took place between Mr. Jelks and Mr. Bussey and asked him if James said that he killed Wilma Arnett.

According to Mr. Clark, he told the detective the same story he had told me-that Mr. Bussey did not make the statement.

6. Finally, we learned that Mr. Clark was informed by Jermaine Jelks that he received an early release from prison for his cooperation in another case.

7. I prepared interview notes of my conversation with Mr. Clark. My investigator, Anthony Bentley, reviewed these notes and initialed each page upon agreeing as to the accuracy of them. A copy of these notes is attached to this affidavit as Exhibit 1.

8. Upon learning of this information from Orande Clark, I filed a Motion for a Warrant to Convey Orande Clark to testify at Mr. Bussey's trial After filing that motion, I either spoke with the prosecutor or the trial judge. During that conversation, I learned that the prosecutor and the trial judge had a conversation where they discussed the existence of Orande Clark's statement to Detective Schlagetter and the State's intent to provide it to me in discovery as Brady material.

9. I spoke with Kevin Yarbrough's trial attorneys on several occasions. I do not recall if I provided the details of Mr. Clark's statement to them.

(Exhibit VV to Post-Conviction Petition, attached to Return of Writ, Doc. No. 10, at 101-103.)

The state courts resolved this claim on the merits. Judge Schmitt's decision on post-conviction reads as follows:

Whether Mr. Clark's statements are true or whether he is believable is conjectural at best as is his contention that he conveyed this information to Detective Schlagetter and that Detective Schlagetter attached any significance to it, or that he recorded it in any fashion whatsoever. Defendant has submitted no evidence to this Court that the alleged conversation to which Clark refers is the same conversation related by Jelks. The Defendant's Exhibit VV does not establish that Mr. Clark's alleged conversation with Detective Schlagetter was ever recorded or reduced to writing or whether such a document, if it did exist was or was not presented to the defense.

The Court has carefully reviewed all of the testimony of Jermaine Jelks. As such, the Court finds that the only value of such testimony (Defendant's Exhibit VV) would be to refute any allegation made by Mr. Jelks as to Mr. Bussey's alleged "confession", since such a

-36-

confession also implicated Defendant. But a review of the record discloses that the topic was never addressed by the prosecution in its direct examination of Mr. Jelks and Mr. Jelks did not volunteer the information. Rather, Defendant first brought up the subject on cross-examination. It was obviously to the Defendant's advantage to do so, since Mr. Jelks' first recounting of the statement implicated someone other than Defendant himself. This caused the prosecutor to address the subject in the first and second redirect, as the parties sparred over Mr. Jelks' recollection of what Mr. Bussey had said. Which side prevailed as a result of the sparring is debatable. However, what is important, is that this Court finds that there is no evidence, either in the record or submitted by the Defendant by way of supplemental affidavit or other proof any kind whatsoever, that Mr. Clark's alleged conversation with Deputy Schlagetter was ever reduced to tangible form and thereafter presented to the prosecutor or ever considered significant in any way by anyone until Defendant first brought Bussey's confession up in order to bolster his own cause.

It is also significant to note that the entire discussion between Jelks and Bussey, especially any statements attributed to Bussey whatever their content, are irrelevant because they are clearly inadmissible hearsay. However, they were introduced into this proceeding by the Defendant. The Defendant should not now be able to benefit from his own invited error.

(Quoted, Return of Writ, Doc. No. 10, at 92.)

In affirming dismissal of the post-conviction petition, the Court of Appeals wrote:

In his nineteenth and twentieth claims for relief, the appellant asserts that he should have been granted an evidentiary hearing on his claim that the prosecution withheld exculpatory evidence and presented false evidence at the appellant's trial. The appellant maintains that (1) the prosecution knowingly allowed a witness, Jermaine Jelks, to testify falsely[9] and (2) the prosecution withheld an exculpatory statement made by Orlande[10] Clark.

The foregoing arguments relate to the testimony of Jermaine Jelks. Jermaine Jelks testified at the appellant's trial that he was told by James

_____

[9]This claim relating to the State's allegedly permitting Jelks to testify knowing he would perjure himself is the Fourteenth Ground for Relief in the Petition, but was withdrawn in the Reply (Doc. No. 26 at 113.)

[10]Spelled "Orande" in Petitioner's reply.

Bussey during a jailhouse conversation that "we killed her." According to Jelks, Bussey was referring in part to the appellant. However, according to Orlande Clark, who was also allegedly present during the conversation, James Bussey did not implicate himself in the murder.

The appellant now contends that the prosecutor knowingly allowed Jermaine Jelks to testify falsely and, further, that the prosecution withheld Orlande Clark's statement from the defense. First, we note that the only written record of the appellant's version of events is the affidavit of James Bussey's former counsel of record. Second, the appellant attempts to hold the prosecution responsible merely because separate witnesses have conflicting versions of the events in question. This is not the law in the State of Ohio. Inconsistencies separate from suborned perjury simply go to the weight of the evidence. *See State v. Shedwick* (Nov. 20, 1997), 1997 Ohio App. LEXIS 5227, Cuyahoga App. No. 71749, unreported.

Having reviewed the record herein, we [find] no merit to the appellant's argument that the prosecution withheld evidence from the defense, nor has the appellant asserted a viable claim that the prosecution allowed Jermaine Jelks to testify falsely. Therefore, the appellant's nineteenth and twentieth claims for relief lack sufficient merit and were properly dismissed without an evidentiary hearing.

*State v. Yarbrough,* 2001 Ohio 2351; 2001 Ohio App. LEXIS 1930*28-30 (Ohio App. 3rd Dist. Apr. 30, 2001).

Because the state courts decided this federal constitutional claim on the merits, this Court reviews under the deferential AEDPA standard. Petitioner asserts (Reply, Doc. No. 26, at 111-112) that our review of *Brady* claims is *de novo*, relying on *Spirko v. Mitchell*, 368 F.3d 603 (6th Cir. 2004). The petition in *Spirko* was filed before the effective date of AEDPA which is not retroactive in its application. *See Spirko,* 368 F. 3d at 604, n. 1, and *Lindh v. Murphy*, 521 U.S. 320, 326 (1997).

The two state courts note the lack of any proof that Clark's statement was reduced to tangible form in any way prior to Jelks' testimony about the conversation, which testimony only occurred because Yarbrough's counsel had "opened the door" during cross. Petitioner argues the *Brady* obligation is not dependent on reduction of the material to tangible form, stating "*Brady* does not

require written evidence." (Reply, Doc. No. 26, at 112, citing *United States v. Schwarz,* 283 F.3d 76, 89-80 (2nd Cir. 2002)). *Schwarz* is not a holding to that effect, it is not a decision of the Supreme Court, and it was, in any event, handed down after the decision of the Court of Appeals in this case. "'Clearly established federal law, as determined by the Supreme Court of the United States" refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Terry Williams v. Taylor*, 529 U.S. 362 at 412 (2000). On the other hand, the Warden does not assert that Brady material must be in writing, but only that its existence must be proved. (Sur-Reply, Doc. No. 31, at 12.)

If Clark's statement was material, it only became so when Jelks testified on re-direct about the content of Bussey's jailhouse statement implicating himself and Yarbrough. The prosecutor did not bring that subject up on direct examination. Petitioner's implicit theory is that at that moment and before re-cross, the prosecutor should have revealed the existence and content of Clark's statement to defense counsel.

The Court accepts Mr. Mayhall's Affidavit as competent proof that Clark told Mayhall that he had spoken to Schlagetter and told Schlagetter the same thing he told Mayhall: that Bussey did not make the statement inculpating himself. All Mayhall knew at the time was that the State intended to present Jelks to inculpate Bussey; there is no indication that anyone expected Jelks to go further and inculpate Yarbrough through recounting Bussey's admissions; "we killed her" implies Bussey plus others, but does not on its face implicate Yarbrough.. As Mr. Mayhall indicates, the State was intending to give him Clark's statement as *Brady* material impeaching Jelks. Of course, not only Bussey, but also Yarbrough had an interest in impeaching Jelks. And Jelks was damaging to Yarbrough not only on account of the Bussey jailhouse conversation, but also because he testified to the payment of money to Yarbrough in Calvin Davis' van.

The difficulty is that there is no further proof of what Clark told Schlagetter before either this Court or the two state courts who considered the matter. Admittedly, Schlagetter would probably not have provided an affidavit voluntarily in post-conviction and discovery was denied there, but nothing has been discovered from Schlagetter in these habeas corpus proceedings either; indeed, Petitioner sought neither discovery nor an evidentiary hearing here. What is before this Court, then, is evidence sufficient to raise a suspicion that a Clark statement was made to Schlagetter which, had it been available to defense counsel at trial, would have been useful in impeaching Jelks. But suspicion is not proof.

Even assuming Clark made such a statement to Schlagetter, this Court concludes it would not have been material because Jelks was thoroughly discredited on cross-examination without the use of the Clark statement. During Jelks' cross, he admitted making contradictory statements on a number of material points, in fact virtually every matter he was questioned about, at different times and to different interlocutors, including law enforcement and Petitioner's investigator, Mr. Wingate. (Trial Tr. 1607-1639.) Furthermore, he was impeached with prior felony convictions and his admitted work as a drug dealer in the employ of Calvin Davis. *Id.* If the jury was not persuaded to discard all of his testimony by the impeaching evidence which it had, it was unlikely to have been persuaded by this additional evidence of his mendacity. (And how credible was Orande Clark in any event?) Impeaching evidence is material for *Brady* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 683 (1985).

Finally, a *Brady* violation only occurs when the State fails to reveal material information which is unknown to the defense. *Brady* "is concerned only with cases in which the government possesses

information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial." *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994). There is no *Brady* violation where the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information or where the evidence is available to the defendant from another source. *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991). No *Brady* violation occurs where the government does not disclose witness statements but the defendant knew that the witness had potentially exculpatory information. *United States v. Todd,* 920 F.2d 399, 405 (6th Cir. 1990).

Mr. Mayhall's Affidavit says he may or may not have discussed the purported Clark statement to Schlagetter with Yarbrough's counsel, although he talked with them several times. ¶ 9 of the Mayhall Affidavit, quoted supra. Yet neither in this Court nor in the state courts has Petitioner offered any evidence from his trial counsel that they did not get this information from Mr. Mayhall. The presumption that a witness would not voluntarily assist which the Court applied above to the failure to submit proof from Detective Schlagetter in post-conviction does not apply to defense counsel. And, of course, nothing has been submitted from defense counsel in this habeas case.

## 2. Jelks' Prior Cooperation with the State

Petitioner also claims in Ground Thirteen that Jelks received early release from prison in another case "which indicates not only his existing relationship with the State, but his willingness to make a deal." (Reply, Doc. No. 26, at 109.)

The Warden concedes the state courts did not decide this claim, but that it is preserved for merit review because it was presented to the state courts (Return of Writ, Doc. No. 10, at 94).

Proof of this asserted *Brady* violation is the statement in the Mayhall Affidavit that Clark told Mayhall that Jelks told Clark that Jelks had "received an early release from prison for his cooperation

in another case" Mayhall Affidavit, ¶ 6, quoted supra.  While that statement gives rise to a suspicion that there may exist somewhere proof that Jelks was convicted, sentenced, helped the State in another case (i.e., a case other than the Arnett murder), and was thereafter released early from prison, there is certainly no satisfactory proof before this Court that such *Brady* material exists.  Defense counsel knew of Jelks' prior convictions – they cross-examined him about them.  It would have been easy enough for them to check the public record to find out if he received an early release.  If such proof exists, it would also have been easy enough for post-conviction counsel to place something of record beyond the Mayhall Affidavit, e.g., copies of relevant journal entries from prior Jelks cases, affidavits from his trial attorneys that they had not been given that information, etc.  None of that was done and nothing further has been done to develop this claim factually in this Court.

Petitioner's Thirteenth Ground for Relief is without merit.  The state court decisions on the Clark statement subclaim are not an objectively unreasonable application of clearly established Supreme Court law.  Reviewing the Jelks prior cooperation claim *de novo,* this Court finds it unproved.

## Conclusion

The Petition herein is without merit and, in the noted instances, some claims are procedurally defaulted as well.  It is therefore respectfully recommended that the Petition be dismissed with prejudice.  Any recommendation on a certificate of appealability is reserved for a supplemental report.

December 28, 2009

s/ **Michael R. Merz**
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).